METROPOLITAN MEDICAL
CENTER, Relator,

v.

Debra A. RICHARDVILLE, et
al., Respondent,

Commissioner of Economic
Security, Respondent.

No. C0–84–203.

Court of Appeals of Minnesota.

Sept. 18, 1984.

James M. Dawson, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for Metropolitan Medical Center.

Daryle L. Uphoff, Lindquist & Vennum, Minneapolis, for Debra A. Richardville, et al.

Hubert H. Humphrey, III, Atty. Gen., Peter C. Andrews, Asst. Atty. Gen., St. Paul, for Com'r of Economic Secy.

Heard, considered and decided by POPOVICH, C.J., and LESLIE and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

This is an unemployment compensation case arising from nurse lay-offs that occurred at Metropolitan Medical Center after the Minnesota Nurses Association gave the hospital a ten-day notice of intent to strike as required by Section 8(g) of the National Labor Relations Act, 29 U.S.C. § 158(g) (1983). Department of Economic Security claims deputies found that the nurses were entitled to unemployment benefits as a result of the lay-offs. Metropolitan Medical Center appealed, asserting that the claimants were engaged in a labor dispute so as to disqualify them from benefits under Minn.Stat. § 268.09, subd. 3 (1982). The appeals referee held that the nurses lost employment due to lockout and, therefore, pursuant to Minn.Stat. § 268.09, subd. 3(b) (1982), were not disqualified from receiving benefits.

The Medical Center appealed the referee's decision to the Commissioner of Economic Security. The Commissioner adopted the referee's findings of fact but altered the decision on legal grounds. He concluded no lockout had occurred but that the nurses were not barred from receiving unemployment benefits under the disqualification for labor disputes contained in Minn.Stat. § 268.09, subd. 3 (1982) because they were not engaged in a work stoppage or slowdown. Metropolitan appeals from this decision. Additionally, pursuant to Minn.R.Civ.App.P. 106, the nurses seek review of the ruling that the lay-offs did not constitute a lockout.

We affirm the determination by the Commissioner that the nurses are eligible for unemployment benefits during the lay-off period, but we base their ability to obtain benefits on our holding that a lockout did occur.

## FACTS

On May 31, 1982, the collective bargaining agreement covering registered nurses at seventeen Twin Cities hospitals, including Metropolitan Medical Center, expired. Minnesota Nurses Association is the exclusive bargaining representative of the registered nurses. The seventeen hospitals are members of a multi-employer bargaining group called Health Employers, Inc.

Negotiations for a new agreement between the union and the hospitals began in late March 1982. A fact finder was appointed from the Federal Mediation and Conciliation Service after negotiations proved unsuccessful and the contract ended. The report of the fact finder did not result in an agreement.

In a bargaining session on June 25, the area hospitals extended an offer to the registered nurses. A general union membership meeting was held on June 29. The nurses rejected the offer and authorized a strike.

This strike authorization was an unprecedented action. Charitable hospitals including Metropolitan Medical Center became covered by the National Labor Relations Act in 1974. From 1974 to May 31, 1982, the hospitals and nurses operated under a collective bargaining agreement that provided for binding arbitration as an alternative to the right to strike.

Section 8(g) of the National Labor Relations Act requires unions to notify health care institutions of intent to strike "not less than ten days prior to such action * * *," 29 U.S.C. 158(g) (1983). Metropolitan Medical Center received the mandatory notice in the early afternoon of July 2, 1982. The notice informed the Medical Center of the intent to strike and picket beginning July 14, 1982, at 6:30 a.m. All other members of Health Employers, Inc., also received notice.

Metropolitan Medical Center, an acute care facility, had adopted a nursing program called primary nursing. Under this program most of the responsibility for patient care is placed in the hands of the 700 registered nurses Metropolitan Medical Center employs. In the event of a strike only 6–8 licensed practical nurses and an estimated 35 non-bargaining unit registered nurses would have been available to care for patients.

Testimony from Medical Center officials was that the Center had begun developing a strike contingency plan approximately a year preceding the contract expiration date in recognition of the fact that the registered nurses could strike at the conclusion of the bargaining agreement. The purpose of the strike contingency plan was to scale down hospital operations over the notice period such that patients could be cared for by non-striking personnel. The plan called for reducing patient census and nursing staff. The average daily census prior to the strike notice was between 450 and 475. Patient census for the strike commencement date was targeted at 170 beds.

On receipt of the July 2 notice of intent to strike, the Medical Center immediately implemented the strike contingency plan. That same day the first nurses were informed that their hours would be reduced to zero. Actual lay-offs started on July 3, and approximately ten percent of the 700 registered nurses were laid-off between that date and July 13, the day a new collective bargaining agreement was ratified.

A former president of the medical staff was hired on the strike notice date to scrutinize patient admissions and accelerate patient discharges. The total patient census was 458 as of midnight on Thursday, July 1; 401 on July 2; 375 on July 3, and 372 on July 4. Census increased on July 5 and 6 to 386 and 400 respectively. Hospital officials testified that this increase was due to unexpected emergency admissions and elective surgeries where patients could be discharged before the intended strike date. Following July 6, the census decreased and on July 10, patient census at midnight was 307. Testimony from a hospital official was that this census was the lowest in hospital history.

Efforts to schedule a date for future negotiations took place between July 2–4, and a bargaining session was scheduled for July 8. A tentative agreement was reached on July 9. This agreement was officially ratified by the union membership on July 13, 1982, and no strike occurred. At the time the tentative agreement was reached, the nurses made a written revocation of the strike notice as requested by counsel for the employers. Metropolitan Medical Center subsequently began recalling laid-off registered nurses.

## ISSUE

Did the Commissioner of Economic Security err in determining that the regis-

tered nurses were eligible for unemployment compensation benefits?

## ANALYSIS

■ Appellate courts will not uphold a decision of the Commissioner of Economic Security that is based upon an erroneous theory of law. *Vicker v. Starkey,* 265 Minn. 464, 470, 122 N.W.2d 169, 173 (1963). This appeal is confined to views of law on statutory disqualification provisions.

■ Under the Minnesota unemployment compensation statute, persons who lose employment because of a labor dispute in which they participate or are directly interested are disqualified from benefits. Minn. Stat. § 268.09, subd. 3 (1982). This disqualification does not apply to a person who becomes unemployed due to a lockout. Minn.Stat. § 268.09, subd. 3(b) (1982).

The Commissioner determined that no lockout occurred:

In reducing staff, the employer did not execute an outlandish reduction, nor did it appear to target certain persons, so that we should infer a motive on its part to use lay-offs as an economic weapon. See *Bucko v. J.F. Quest Foundry Company,* [229 Minn. 131], 38 N.W.2d 223 (Minn.1949), *Sunstar Foods v. Uhlendorf,* 310 N.W.2d 80 (Minn.1980).

Thus, the Commissioner's decision turned on whether there was an act by the employer evidencing an abusive intent. This is an error of law.

■ A lockout for unemployment compensation purposes is defined by reference to the Minnesota Labor Relations Act, Minn.Stat. § 179.01(9) (1982), as "the refusal of the employer to furnish work to employees as a result of a labor dispute." *Bartell v. National Valve and Manufacturing Co.,* 302 Minn. 521, 223 N.W.2d 476 (1974); *Sunstar Foods, Inc. v. Uhlendorf,* 310 N.W.2d 80 (Minn.1981). The Minnesota Supreme Court has refused a strictly limited definition when reviewing whether a

lockout occurs due to unreasonable wage reductions. *Id.* In the special context of contingency planning during the ten-day strike notice period mandated by the National Labor Relations Act, we similarly conclude the provision on lockout should be broadly construed. During this period, an employer must make a maximum effort to protect employment by using methods short of lay-offs to prepare for a strike. Lay-offs effected absent the use of such alternative methods will be construed as a lockout.

■ In the present case, Metropolitan Medical Center contends the lay-offs were effected pursuant to a strike contingency plan necessary for patient welfare and no unreasonable staff reduction occurred. They thus assert that the lay-offs were not used as an economic weapon.

Under the standard set forth above, it is not enough to show a reasonable correlation between patient census reductions and lay-offs to justify the employer's acts. Lay-offs should be a matter of last resort. The evidence showed no effort by Metropolitan Medical Center to avoid or delay work force reductions, nor did it attempt alternative methods of reduction such as voluntary leaves. We therefore conclude that under the facts of this case the lay-off of employees constituted a lockout and that the nurses are entitled to unemployment compensation.

■ Our view of what constitutes a lockout under these circumstances comports with the purpose of the unemployment compensation statute. The aim of the statute is to provide benefits for persons who become unemployed through no fault of their own. Minn.Stat. § 268.03 (1982). *See Johnson v. Ford Motor Co.,* 289 Minn. 388, 184 N.W.2d 786 (1971). At all times during the notice period, the laid-off nurses were ready and willing to work. The mere fact that the nurses are required by federal law to give a ten-day notice of intent to strike is not indicative of fault.

In addition, when examining fault involved in a lockout the appellate courts refuse to look at preliminary events which may have prompted the action. *Bucko v. J.F. Quest Foundry Co.*, 229 Minn. 131, 143, 38 N.W.2d 223, 231 (1949).

Even though the Commissioner determined that no lockout occurred, he concluded that the nurses were entitled to benefits because the labor dispute disqualification would not be triggered without a work stoppage of some sort. Occurrence of a lockout eliminates disqualification due to a labor dispute, Minn.Stat. § 268.09, subd. 3(b), and thus we do not rule on the interpretation of the disqualification.

## DECISION

We affirm the conclusion of the Commissioner of Economic Security that the nurses are entitled to benefits, but we base this on the grounds that a lockout occurred.

Affirmed.